**Alta CHRAPLIWY, et al., Plaintiffs-Appellants and Cross-Appellees,**

v.

**UNIROYAL, INC., a corporation, Defendant-Appellee and Cross-Appellant.**

**Nos. 81–1557, 81–1633.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 1, 1981.

Decided Feb. 16, 1982.

Rehearing and Rehearing En Banc Denied
April 13, 1982.

---

Thomas R. Ewald, Washington, D. C., for plaintiffs-appellants and cross-appellees.

Rody P. Biggert, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellee and cross-appellant.

Before CUMMINGS, Chief Judge, FAIRCHILD, Senior Circuit Judge, and BROWN, Senior District Judge.*

FAIRCHILD, Senior Circuit Judge.

The plaintiffs in this case are female workers who were employed by the defendant. In 1972, they filed a class action under Title VII of the Civil Rights Act of 1964, alleging that the defendant had engaged in the practices of segregated hiring and seniority rosters.

In 1979, the parties reached a settlement favorable to the plaintiffs, amounting to $9,318,000 in cash and pension benefits, in addition to reinstatement of 296 terminated class members to active employment with full seniority. The defendant also agreed to pay attorneys' fees to the plaintiffs, in an amount to be established by the district court.

Accordingly, the plaintiffs applied to the district court for an allowance of attorneys' fees pursuant to Section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k), with an initial amount of $1,510,768 for the number of hours worked times the hourly rates for the plaintiffs' eleven attorneys. The plaintiffs also sought additional allowances for the risks of litigation and quality of representation.

The district court allowed a fee of $833,679, which included an initial amount of $583,679 for hours times hourly rates, $50,000 for the risks of litigation, and $200,000 for the quality of representation.

The plaintiffs have appealed this fee award, claiming that the district court erred in lowering the hourly rates and number of hours worked. The plaintiffs further claim that the district court abused its discretion in awarding only $250,000 for risk and quality. The defendant has filed a cross-appeal, challenging only the additional $250,000 awarded for risk and quality as too generous.

Thus, the issues raised by this appeal concerning the district court's award of attorneys' fees to the prevailing plaintiffs,

pursuant to Section 706(k), 42 U.S.C. § 2000e–5(k), are as follows:

1. Did the district court err in concluding that as a matter of law it was required to refuse to award attorneys' fees to the prevailing plaintiffs for time spent persuading the federal government to debar the defendant from its federal contracts on account of discrimination in employment, although these efforts by the plaintiffs led to the settlement of the Title VII action?

2. Did the district court err in concluding that as a matter of law it was required to lower the hourly rates customarily charged by the plaintiffs' attorneys to rates within the range of hourly rates customarily charged by attorneys in the locality where the district court sits?

3. Did the district court abuse its discretion in awarding to the plaintiffs additional fees of $50,000 for the risks of litigation and $200,000 for the quality of representation?

We find that the district court erred in concluding that as a matter of law it was required to refuse to award attorneys' fees for the time spent by the plaintiffs persuading the federal government to debar the defendant from its federal contracts. We also find that the district court erred in concluding that as a matter of law it was required to lower the hourly rates customarily charged by the plaintiffs' attorneys to rates customarily charged by attorneys in South Bend, Indiana, where the district court sits.

We find that the district court did not abuse its discretion in awarding $50,000 for risks and $200,000 for the quality of representation. However, in light of our conclusions as to the initial amount determined by the district court, it will be necessary that on remand the district court also reconsider the award of $200,000 for quality.

## I. FACTS

The plaintiffs brought a class action in 1972 pursuant to Title VII of the Civil

---

* Senior District Judge Wesley E. Brown of the District of Kansas sitting by designation.

Rights Act of 1964 on behalf of all female workers employed by the defendant at its plastics plant in Mishawaka, Indiana. The plaintiffs challenged the defendant's system of segregated hiring and seniority. In July of 1973, the district court granted the plaintiffs' motion for partial summary judgment on issues of liability, based on the defendant's continued failure to respond to requests for admissions. This decision established the defendant's general liability for sex discrimination. See Chrapliwy v. Uniroyal, Inc., 509 F.Supp. 442, 445 (N.D.Ind. 1981).

In October of 1974, Judge Beamer, who had been handling the case, died. His death and the resulting vacancy on the district court delayed further proceedings.

Time was passing, and there was further delay. It appeared that defendant was taking advantage of the situation, and doing nothing to provide relief for members of the plaintiff class. Beginning in 1975, plaintiffs sought to obviate further delay in the Title VII action by attempting to persuade the federal government to notice defendant's discriminating practices which were the subject of the Title VII action and to take action against defendant based on such discrimination.[1] These activities resulted in several court and administrative proceedings, involving the plaintiffs, the defendant, and the Departments of Labor, Defense, and the Interior. See Chrapliwy, supra, 509 F.Supp. at 445–448.

The defendant first attempted to use the Title VII action to stave off the government's investigation under Executive Order 11246. The Department of the Interior had issued a deficiency letter to the defendant, and the defendant's response was that since the Title VII suit was underway, it was already defending itself against the same charges of discrimination. The Department initially agreed to defer action pending the outcome of the Title VII suit, but began an active investigation of the defendant's possible violation of Executive Order 11246 when the plaintiffs continued to press the government to act. See Chrapliwy, supra, 509 F.Supp. at 445–446.

In February of 1976, the defendant moved to dismiss the Title VII action, claiming that the plaintiffs' pursuit of relief through enforcement of Executive Order 11246 amounted to misconduct.[2] The court denied the motion, upholding the plaintiffs' right to pursue the defendant's debarment, which involved issues identical to the basic issues in the Title VII action itself.[3] The court noted that "[a]s representatives of the class, [the plaintiffs] were charged with the responsibility of initiating what ever action would be necessary to vindicate the rights of the entire class against the alleged discriminatory employment practices of Uniroyal." [4]

In October of 1979, less than one week before the defendant was to lose a large federal contract as a result of the government's investigations of a violation of Executive Order 11246, the parties settled the Title VII action. The district court found that the plaintiffs' efforts to persuade the government to debar the defendant from its federal contracts directly contributed to the settlement of the Title VII action. See Chrapliwy, supra, 509 F.Supp. at 451. The defendant admitted that it would not have settled the suit if the threat of debarment did not loom near. Id.

In making the award of attorneys' fees, the district court first determined that it should calculate fees by the "lodestar" method. Id., at 449–450.[5] The court evi-

---

1. Executive Order 11246 prohibits federal contractors from discriminating against employees on the basis of sex, race, or other impermissible grounds. The contractor can be debarred from its contracts and declared ineligible for future contracts in the event of noncompliance with the Order.

2. See Chrapliwy, supra, 509 F.Supp. at 461.

3. See id., at 466.

4. Unpublished Memorandum of June 8, 1976, Joint Appendix, 175, 177.

5. The method for determining a "lodestar" amount is to multiply the allowable hours worked by a reasonable hourly rate for each attorney. This "lodestar" amount may then be raised or lowered to recognize other factors.

dently found that the number of hours requested by the plaintiffs had been reasonably expended, reducing those hours only to the extent necessary to preclude the plaintiffs from receiving attorneys' fees for the hours spent in persuading the federal government to debar the defendant from its federal contracts. Likewise, the court evidently determined that the hourly rates requested by the plaintiffs were reasonable, ranging from $200 and $175 per hour for counsel from New York and Washington, D. C., respectively, down to $50 to $70 per hour for counsel from around the South Bend area, where the district court sits. The court noted that:

> The caliber of counsel here was equally matched. This is not the case of a small, relatively unsophisticated corporate defendant, suddenly faced with high priced counsel running up the clock at an exorbitant hourly rate. The rate on both sides reflects the price talented lawyers can command. It would not advance the congressional policies ... to arbitrarily limit plaintiffs' attorneys to the local billing rate when the defendant has utilized the resources of equally expensive, and presumably equally talented, attorneys. If Uniroyal had primarily used local counsel in its defense, it would have a far better argument in favor of restricting [plaintiffs] to the local billing rate.... The legal profession no longer operates in a strictly local product market, and the attorney's fee provision of Title VII cannot

be utilized to unrealistically tie the fees paid to the locality's wage scale.
*Chrapliwy, supra,* 509 F.Supp. at 456.

The district court further decided to use present instead of historical billing rates, to offset inflation which had increased the price levels above those in effect at the time the suit was instituted in 1972.[6]

After determining that the rates and hours were reasonable, however, the district court decided that the requested billing rates had to be "balanced" against the local billing rates in the South Bend area. *Id.,* at 456–457. Based on affidavits submitted by the defendant, the court found that the local rates ranged from a low of $35 per hour in 1973 to $85 per hour in 1980, depending, however, on the skill of the attorney. *Id.,* at 455.

Although the court referred to "balancing" the rates requested by the plaintiffs against the local rate, the court in fact limited the plaintiffs to a local rate. *Id.,* at 458–459. The court set rates ranging from $75 per hour for counsel from Washington, D. C. and New York to $50 per hour for others. *Id.*

The district court excluded all hours spent by the plaintiffs to persuade the federal government to enforce Executive Order 11246 and debar the defendant from its federal contracts. The court determined that the statutory language of Section 706(k) and the holding in *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) precluded an award of fees for such work. *Id.,* at 451–453.

---

Various courts of appeals have adopted the "lodestar" method. *See, e.g., Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir.1980); *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973); *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093 (2d Cir. 1977); *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir. 1975).

This court has never expressly adopted the "lodestar" method as such. We have, however, approved a method of calculating fees which approximates the "lodestar" approach. In *Waters v. Wisconsin Steel Works,* 502 F.2d 1309 (7th Cir. 1974), and, more recently, in *State of Ill. v. Sangamo Construction Co.,* 657 F.2d 855 (7th Cir. 1981), we approved of using

"hours times billing rate" as a convenient starting point in determining a fee award "from which adjustments can be made for various other elements." *Waters, supra,* 502 F.2d at 1322.

6. The court noted that the Consumer Price Index for October 1972 was 126.6. In July, 1980 it was 248, an increase of 95% over eight years. *Chrapliwy, supra,* 509 F.Supp. at 457. Compensation for delay might have been achieved by computation of interest, a percentage allowance for inflation, or a similar allowance in choosing a so-called multiplier. No party seems to challenge the device the court used.

After determining the basic fee of allowed hours times allowed rates, amounting to $583,679, the district court evaluated the factors listed in *Waters, supra*, 502 F.2d at 1322, for determining the reasonableness of a fee. Accordingly, the court raised the basic fee by $50,000 for risk and $200,000 for the quality of representation. *Id.*, at 459–462.

## II. HOURS REASONABLY EXPENDED

■ In general, a district court's award of attorneys' fees will only be reversed if the court abused its discretion.[7] Error of law, however, is also a ground for reversing what would ordinarily be a discretionary ruling.[8] If a judge erroneously thought the law required him to do what he did, the judge did not exercise discretion.

We are also mindful of the congressional goal of eliminating discriminatory practices in employment by encouraging private litigants who are injured by such practices to bring Title VII actions. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 420, 98 S.Ct. 694, 699, 54 L.Ed.2d 698 (1978).[9] Congress intended to encourage these private litigants to hire counsel capable of putting forth a rigorous prosecution to meet the rigorous defense which defendants would be likely to assert. *Id.*, at 419, 98 S.Ct. at 699.

As we have stated before, in *Waters, supra*, 502 F.2d at 1322, and *State of Ill. v. Sangamo Construction Co., supra*, 657 F.2d at 855, 862 (7th Cir. 1981), the convenient starting point for determining a reasonable fee award is to multiply "the reasonable hours devoted to the litigation [by] the reasonable billing rate for that work." *Sangamo Construction Co., supra*, 657 F.2d at 862. Once that basic fee is determined, it may be adjusted upward or downward, based on the elements outlined in *Waters*, if necessary to arrive at a reasonable fee.[10]

The first step in the analysis outlined in *Waters* and *Sangamo Construction Co.* is to determine the number of hours reasonably expended to obtain relief in the action. It is recognized that a judge, from experience, is sufficiently informed so that he may exercise some discretion in deciding that the requested number of hours was not reasonably expended.[11] In this case, counsel for each party worked approximately 11,000 hours. This similarity of hours expended would make it difficult to reduce the plaintiffs' claim of hours spent on that ground, and the district court did not do so.

The district court did, however, reduce the plaintiffs' requested hours to preclude recovery for their efforts to persuade the federal government to debar the defendant from its federal contracts. The court determined that *Carey, supra*, and Section 706(k)

7. *See, e.g., Waters, supra*, 502 F.2d at 1322; *Mirabal v. General Motors Acceptance Corporation*, 576 F.2d 729, 730 (7th Cir. 1978); *Coop v. City of South Bend*, 635 F.2d 652, 655 (7th Cir. 1980).

8. *See, e.g., Syvock v. Milwaukee Boiler Manufacturing Co., Inc.*, 665 F.2d 149, 162 (7th Cir. 1981).

9. *See also Parker v. Califano*, 561 F.2d 320 (D.C.Cir.1977); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

10. This mode of analysis established in *Waters* is similar to the "lodestar" method discussed *supra*, at footnote 3.

Other recent decisions of this court are consistent. In *Mills v. Eltra, Appeal of Ratner*, 663 F.2d 760, 763 (7th Cir. 1981) the court allowed a fee computed by multiplying the number of hours reasonably expended by 150% of the applicant's normal billing rate. The higher rate

was used as a multiplier because the case was considered a contingent fee case. At pp. 764, 765.

In *Syvock v. Milwaukee Boiler*, 665 F.2d 149, 162–165 (7th Cir. 1981) we held that the district court applied *Waters* without abuse of discretion in determining initially the number of compensable hours and in refusing an additional 25% on account of the contingent character of the arrangement. We held, however, that the judge erred in a further reduction of hours because plaintiff did not succeed on all elements of his claim, and we directed an increase in the fee to correct that error.

11. For example, an attorney may overstate his hours mistakenly, through faulty records. There may be duplication of services by two attorneys. The attorney may have devoted time inefficiently or have otherwise accumulated a number of hours beyond those reasonably required for the case.

of Title VII precluded an award for these hours. In this respect, we think the court erred.[12]

In *Carey*, the plaintiff first filed a claim of discrimination with the EEOC. The EEOC, as required by Title VII, deferred to the proper state administrative agency. When the EEOC later issued a right to sue letter, the plaintiff filed a Title VII action in federal court. A settlement was reached in the state proceedings, so the Title VII action was voluntarily dismissed, with the exception of the petition for attorneys' fees.

The Supreme Court held that Section 706(k) of Title VII authorized "an award of attorney's fees for work done by the prevailing complainant in state proceedings to which the complainant was referred pursuant to the provisions of Title VII." *Carey, supra*, 447 U.S. at 71, 100 S.Ct. at 2034.

The district court interpreted *Carey* as requiring the exclusion of fees for services related to "collateral proceedings" except when those proceedings are mandated by Title VII. *Chrapliwy, supra*, 509 F.Supp. at 452. The court concluded that the various actions taken by the plaintiff to persuade the government to debar the defendant were not "mandatory procedures" and consequently counsel's services therein could not be compensated, based on the rule in *Carey. Id.*

The services at issue in *Carey* were performed in the course of state proceedings. The Title VII action produced little except the award of attorney's fees. The Supreme Court decided that the statute authorized an allowance in a Title VII action for services rendered and results obtained primarily outside of the Title VII action, in state court and administrative proceedings.

 The case before us is substantially different from *Carey*. The Title VII action

was well underway when the plaintiffs began activities regarding the defendant's debarment. Class certification had been granted; discovery had begun; and partial summary judgment had been granted in favor of the plaintiffs as to the defendant's liability. The defendant delayed in responding to discovery requests. Judge Beamer's death caused further delays. Time was passing, and the plaintiffs sought an efficacious way to bring about an end to the Title VII action with relief for all class members. The plaintiffs' pursuit of the defendant's debarment was a viable avenue for obtaining such relief, because the issues and factual background were the same for both the Title VII action and the enforcement of Executive Order 11246.[13]

The plaintiffs' efforts proved successful. The perseverance of the plaintiffs in their efforts to persuade the government to debar the defendant from its federal contracts led directly to the settlement of the Title VII action.

In responding to the defendant's motion to dismiss the Title VII action because of the plaintiffs' efforts to have the defendant debarred, the district court noted that the plaintiffs were carrying out their responsibilities as representatives of the class in doing whatever was necessary to vindicate the rights of the class against the discriminatory employment practices of the defendant.[14] Thus, the district court recognized that the plaintiffs pursued the debarment of the defendant for the purpose of achieving their ultimate goal of relief in the Title VII suit. We do not read *Carey* as precluding an award of attorney's fees for such efforts.

If *Carey* has any application to the particular question before us, it is in indicating

---

**12.** If the district court had first decided that the award of attorneys' fees for the plaintiffs' efforts to have the defendant debarred from its federal contracts could be granted as a matter of law but then for some reason determined that such an award should not be granted based on special circumstances of the case, then our task would be to ask first whether the court erred as a matter of law in determining

that such fees could be granted and second whether the court abused its discretion in refusing to award such fees.

**13.** Unpublished Memorandum of June 8, 1976, Joint Appendix, 175, 176.

**14.** *Id.*, at 177.

that the statute should be liberally rather than restrictively interpreted with respect to fees for services not performed, in the ordinary sense, in proceedings before the Title VII court. The Supreme Court expressly recognized that a liberal view toward fees would further Congress' goal of "[making] it easier for a plaintiff of limited means to bring a meritorious suit." 447 U.S. at 63, 100 S.Ct. at 2030, *quoting Christiansburg Garment Co., supra,* 434 U.S. at 420, 98 S.Ct. at 699.

The district court further decided that the language of Section 706(k), apart from *Carey,* prohibited including compensation for plaintiffs' efforts to have the defendant debarred from its federal contracts. *Chrapliwy, supra,* 509 F.Supp. at 451. Section 706(k) permits a fee award "In any action or proceeding under this subchapter...." The district court read this language as requiring "that the attorney's time and efforts be mandated by the Title VII statute, or by related and required procedures" and his "time must be within the Title VII procedure." *Id.*

We think this interpretation of Section 706(k) is too narrow. The plaintiffs at all times pursued their Title VII action. Their efforts to have the defendant debarred from its federal contracts on the basis of the same discrimination charged in the Title VII action were designed to move the Title VII case toward ultimate disposition. This desired effect was achieved, because the threat of debarment on account of discrimination caused the defendant to settle the Title VII action. Thus, the plaintiffs' pursuit of debarment was a service which contributed to the ultimate termination of the

Title VII action, and in that sense was within the Title VII action.

 We therefore conclude that neither Section 706(k) nor the *Carey* interpretation thereof precludes an award of attorneys' fees to the prevailing plaintiffs for their efforts in persuading the federal government to enforce Executive Order 11246. Rather, Section 706(k) should be interpreted as allowing attorneys' fees to the prevailing plaintiffs for services which contribute to the ultimate termination of the Title VII action.[15]

## III. REASONABLE BILLING RATE

The second step in the analysis outlined in *Waters* and *Sangamo Construction Co.* for determining an award of reasonable attorneys' fees is to determine the reasonable billing rate.

 From the outset, we recognize that a particular attorney may have special skills or experience which raise the value of his time above the value of another attorney's time. However, here again, as with hours, a judge is not required to accept an attorney's valuation of his own time. A judge may well approach high rates with skepticism, and he may exercise some discretion in lowering such rates.[16]

In the case before us, the district court evidently determined that the hourly rates requested by the plaintiffs for each attorney were reasonable. *Chrapliwy, supra,* 509 F.Supp. at 455–456. The court noted that the defendant's attorneys billed the defendant at rates comparable to the hourly rates sought by the plaintiffs. Furthermore, the

---

**15.** *Accord, Kulkarni v. Alexander,* 22 FEP Cases 1470, 1477 (D.C.Cir.1978). *See also Sullivan v. Bureau of Vocational Rehab.,* 663 F.2d 443 (3d Cir. 1981); *Porter v. District of Columbia,* 502 F.Supp. 271 (D.D.C.1980). *Cf. Kennedy v. Whitehurst,* 509 F.Supp. 226 (D.D.C. 1981). We note that the fact that neither the plaintiffs nor the defendant were formal parties in all of the "collateral proceedings" is irrelevant to our conclusion. The plaintiffs and defendant were parties in the Title VII action, and we have concluded that the plaintiffs' activities

regarding debarment contributed to the outcome of the Title VII action.

**16.** For example, an attorney may be overqualified for particular services which could reasonably be performed by a less skilled or experienced attorney or by a lay person. In such a case, it may be unreasonable to value the attorney's time at his regular billing rate. Or, an attorney may bill at a high rate but rarely collect at that rate.

court noted that the caliber of counsel for each side was equally matched. Both sides utilized the services of widely recognized attorneys. Finally, the court noted that the congressional policy of Section 706(k) would not be advanced by arbitrarily limiting the plaintiffs' attorneys to a "local" billing rate when the defendant utilized equally expensive and equally talented attorneys. *Id.*

█ The court decided, however, that "the plaintiffs' attorneys' billing rate must, of course, be balanced against the local billing rate to achieve the reasonable rate required by the statute." *Id.*, at 456. The local rates in the South Bend area were found to be approximately $85 per hour in 1980. *Id.*, at 455. In "balancing" local rates with the plaintiffs' requested rates, the court actually limited the rates to local rates. The court lowered the rate of lead counsel from Washington, D. C. from $175 per hour to $75 per hour; and the rates of other New York and Washington counsel from $200 to $75, $110 to $50, and $175 to $75.[17]

We think the court erred as a matter of law in limiting the hourly rates to local rates charged in the South Bend area.

█ If a high priced, out of town attorney renders services which local attorneys could do as well, and there is no other reason to have them performed by the former, then the judge, in his discretion, might allow only an hourly rate which local attorneys would have charged for the same service. On the other hand, there are undoubtedly services which a local attorney may not be willing or able to perform. The complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally.

█ In our case, the district court did not question the reasonableness of the hourly rates requested by the plaintiffs. The court recognized that the defendant availed itself of counsel charging rates comparable to the rates requested by the plaintiffs.[18] The court did not indicate skepticism over the need for out of town counsel. In fact, the court recognized that Congress intended to encourage plaintiffs to employ counsel capable of putting forth a rigorous prosecution to meet the rigorous defense which defendants would most likely assert.

The district court's discussion of "local billing rates versus the attorney's usual billing rate" is set forth in 509 F.Supp. at 455–457. In treating the *Waters* listing of "The fee customarily charged in the locality for similar legal services" as a factor to be considered, the court seems to have read "locality" as "locality where the cause is heard."

█ The fee customarily charged for similar services in the locality where services are rendered is doubtless relevant even

---

**17.** The rates of local assisting counsel were reduced without explanation.

**18.** The defendant has argued that comparing the rates charged by its attorneys with those charged by the plaintiffs' attorneys is improper. We reject this argument. The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case. Also, when the defendant has hired expensive, out of town counsel, the plaintiffs seem justified in saying that the nature of the case required the skills of out of town specialists. *See North Slope Borough v. Andrus*, 515 F.Supp. 961 (D.D.C. 1981). Such a comparison of rates does not conflict with this court's holding in *Mirabal, supra*, 576 F.2d at 730–731. In that case, the plaintiff recovered $2,000 under the Truth in Lending Act, and then requested a fee of $30,000, arguing that such a fee was reasonable because the defendant's attorney received a similarly high fee. This court held that a fee award in excess of the judgment would require circumstances not present in the case, and that granting large fee awards for small injuries would encourage litigation not in the interests of clients or the public. This court noted that determining the plaintiff's fee based on the fees charged by the defendant's attorney may have little relevance to the value which the plaintiff's attorney provided in the case. In the case before us, however, we suggest that the hours and hourly rates charged by the defendant's attorneys provide a helpful guide in determining whether similarly high rates and hours requested by the plaintiffs were reasonable.

where the attorney normally practices elsewhere. On the other hand the *Waters* list of factors comes from American Bar Association Disciplinary Rule 2–106, which begins with a prohibition against charging clearly excessive fees. In that context the fee customarily charged for similar services in the locality, if different, where the attorney normally practices is also relevant. Pertinent questions where, as here, a court is fixing a fee to be paid by an opponent are whether services of like quality are truly available in the locality where the services are rendered, and whether the party choosing the attorney from elsewhere acted reasonably in making that choice. There is no suggestion that the district court would have answered either of these questions adversely to plaintiffs.

Attorneys with specialized skills in a narrow area of law, such as admiralty law, patent law, or antitrust and other complex litigation, tend to be found in large cities, where an attorney may have a greater opportunity to focus on a narrow area of law. As a specialist, the attorney will usually charge more for performing services in his area of expertise than a general practitioner will charge for performing similar services. Furthermore, the costs of practicing law will vary from city to city, and such costs will be reflected in the rates of the attorneys.

We think that a judge, in allowing an attorney's fee under Title VII or similar statute, has discretion to question the reasonableness of an out of town attorney's billing rate if there is reason to believe that services of equal quality were readily available at a lower charge or rate in the area where the services were to be rendered.

If, however, a party does not find counsel readily available in that locality with whatever degree of skill may reasonably be required, it is reasonable that the party go elsewhere to find an attorney, and the court should make the allowance on the basis of the chosen attorney's billing rate unless the rate customarily charged in that attorney's locality for truly similar services is deemed to require an adjustment.

In any event, "The fee customarily charged in the locality" remains one of a number of factors to be considered as guides, and nothing in *Waters* or the Disciplinary Rule makes that factor an overriding limitation.

Although the district court seems to have disclaimed limiting counsel to South Bend rates, it appears that that in fact happened, without any suggestion that the choice of counsel was improvident or counsel's billing rates were out of line with those charged by available counsel of similar expertise, otherwise similarly situated. We conclude there was error. In our view the allowance should have reflected the billing rates as requested. It follows that when the number of hours, as restored, are multiplied by the billing rates requested, the initial amount determined will be close to the $1,510,768 for which plaintiffs contend, subject to minor adjustments.[19]

## IV. RISK AND QUALITY

The third and final step in the analysis of determining an award of reasonable attorneys' fees is to evaluate the eight guidelines listed in *Waters, supra*, 502 F.2d at 1322, which in some cases may require an adjustment, upward or downward, of the basic fee of hours times hourly rate. In this case, the district court adjusted the basic fee awarded to the plaintiffs upward, to allow an extra $50,000 for risk and $200,000 for quality of representation. Both the plaintiffs and the defendant challenge this extra award as an abuse of the trial court's discretion, the plaintiffs claiming that the

19. The district court's opinion includes a table which states the requested hours and requested rates for the plaintiffs' attorneys' fees. *See Chrapliwy, supra*, 509 F.Supp. at 458–459. The plaintiffs have included a similarly constructed table in their reply brief, but the number of hours requested differs from the number shown on the district court's table. We leave to the district court the task of determining the need for any adjustments in these numbers.

award is low, and the defendant claiming that the award is high.

■ The district court explained in detail its reasons for granting this extra award above the basic fee. First, the court noted that the plaintiffs' attorneys worked for seven years without compensation. Their fees were contingent on the outcome of the litigation. They invested over 11,000 hours, plus expenses, in this risk. They faced a long and difficult battle against equally talented attorneys for the defendant, "no ground was surrendered without a struggle, and Uniroyal litigated each issue in this case until the debarment proceeding commanded a final settlement." *Chrapliwy, supra*, 509 F.Supp. at 460. Fifty thousand dollars to account for the risks involved in representing the plaintiffs on a contingent basis in a complex class action is a modest, if not meager, award.

The plaintiffs claim that the risks were substantially greater than the district court recognized, while the defendant claims that the plaintiffs faced relatively no risks after the initial summary judgment in July of 1973. The allowance of $50,000 for risk reflects the district court's careful evaluation of the facts, and though the allowance is meager, we cannot say the district court abused its discretion in fixing the amount.

■ Second, in awarding $200,000 for quality, the court found that the plaintiffs' attorneys brought to this litigation experience, reputation, and ability in handling complex cases, particularly the ability to handle Title VII cases. The court determined that the results obtained for the plaintiffs, after years of opposing the talented, nationally recognized law firms representing the defendant, demonstrated these abilities. Indeed the total recovery was substantial, some $9,000,000, cash in part and value of benefits in part, as well as reinstatement of nearly 300 employees. The court also noted that one of the results obtained was that the "actions of the plaintiffs' attorneys forced the Labor Department to create a working enforcement system to implement Executive Order 11246, and police other federal contractors in their compliance with its procedures." *Chrapliwy, supra*, 509 F.Supp. at 462.

The district court's consideration of quality was appropriate, and the court carefully evaluated its reasons for allowing the extra $200,000 for quality. However, we have determined that the plaintiffs should be awarded a basic fee which reflects the requested hourly rates of each attorney. The hourly rates for the plaintiffs' out of town counsel are higher than rates charged by attorneys in the South Bend area. The reason for allowing the higher rates is that the nature of the case commanded the expertise of attorneys with specialized skills in handling complex litigation and Title VII cases. These experts charge higher fees than local attorneys because of the quality of representation they provide in their area of expertise. Thus, the hourly rates to be allowed by the district court on remand of this case seem to include some of the elements considered in the court's quality award, so that the $200,000 awarded by district court for quality may overlap with the quality factor implicit in the hourly rates.

Furthermore, we have determined that the plaintiffs are to be awarded attorneys' fees for their efforts in persuading the government to debar the defendant from its federal contracts. The district court seems to have included something for these efforts in the award for quality. The district court should determine on remand whether there is any duplication.

As a result of these possible overlaps, we direct that on remand the court should, if it finds unfair duplication in the award for quality, make an appropriate adjustment.

## V. CONCLUSION

Insofar as the district court's judgment limited recovery of attorneys' fees for the prevailing plaintiffs to $583,679 for the ba-

sic fee of hours times hourly rates, and insofar as it reflected an additional $200,000 for quality, it is reversed, and the cause remanded for further proceedings consistent with this opinion. In all other respects the judgment is AFFIRMED. Circuit Rule 18 shall not apply on remand. Costs of appeal, including attorneys' fees, are allowed to appellants.

The district court is directed to determine the amount of fees to be awarded to the plaintiffs for the services of their attorneys in this appeal. Although the plaintiffs have not prevailed on all issues argued, we consider the time spent to address issues on which they have not prevailed to have been reasonably expended.[20]

---

20. *See Syvock, supra,* 665 F.2d at 164.