**AMERICAN KNIGHTS OF THE KU KLUX KLAN, Plaintiff,**

v.

**CITY OF AUBURN, INDIANA, Defendant.**

No. 1:97–CV–267.

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 18, 1997.

Kenneth J. Falk, Indiana Civil Liberties Union, Hamid R. Kashani, Indianapolis, IN, for American Knights of the Ku Klux Klan.

Kirk D. Carpenter, Mefford and Carpenter, Auburn, IN, for Auburn, City of.

## ORDER

LEE, Chief Judge.

Before the Court are four motions: Plaintiff's Petition for Attorney Fees and Expenses, Plaintiff's Request for Entry of Judgment, Plaintiff's Motion to Strike Defendant's Response, and Defendant's Motion to Accept Belated Filing.

For the reasons provided below, the Court DENIES Plaintiff's Motion to Strike, DENIES Plaintiff's Request for Entry of Judgment, GRANTS Defendant's Motion to Accept Belated Filing, and GRANTS Plaintiff's Petition for Attorney Fees and Expenses in the amount of $8,397.12.

## BACKGROUND

It was a request submitted by the Plaintiff, American Knights of the Ku Klux Klan ("the Klan"), for a permit to conduct a rally on the steps of the DeKalb County Courthouse in Auburn, Indiana, that generated this flurry of motions. Though the National Imperial Wizard, the Reverend Jeffrey Berry, made the request on February 1, 1997, well in advance of the rally scheduled for Saturday, July 19, 1997, the Defendant City of Auburn ("the City") could not agree with the Klan on how many ralliers would be permitted to stand together on the steps of the Courthouse. The City, believing that the Reverend Berry was not providing them with an accurate estimate of how many ralliers would in fact show up, limited the number to 20, based on the previous experience of the Indiana State Police with Klan rallies. See Affirmation of Kerry L. Uhrick, Chief of Police, City of Auburn, ¶¶ 8–9, attached to Memorandum of Law in Support of Defendant's Response to Plaintiff's Petition (R. 19). On July 18, 1997, Plaintiff filed a Verified Complaint for Injunctive and Declaratory Relief (R. 1) and a Motion for a Temporary Restraining Order or Preliminary Injunction (R. 2). The Klan claimed that the City's proposed limitations would violate the First Amendment rights of its members, and requested that 50 ralliers, the number which the Reverend Berry estimated would attend, be permitted to stand together on the Courthouse steps. Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order or Preliminary Injunction (R. 3), at 4. On July 18, the parties appeared before this Court and negotiated a Settlement Agreement which provided that the rally area would be expanded to accommodate approximately 50 ralliers. Settlement Agreement, attached to Plaintiff's Petition for Attorney's Fees and Expenses (R. 14), ¶ 1(a) and (b). The Settlement Agreement provided that Plaintiff would file a petition for attorney's fees (¶ 4) and that Defendant denied liability and would oppose such a motion (¶¶ 4 and 8).

Plaintiff mailed its Petition for Attorney's Fees and Expenses (R. 14, Memorandum in Support, R. 15, Exhibits, R. 16) on September 17, 1997, and it was filed by the Clerk of the Court on September 19. Plaintiff requested Entry of Judgment on October 14, 1997, arguing that Defendant had missed the October 6, 1997, deadline to respond under L.R. 7.1. Plaintiff's Request for Entry of Judgment on Plaintiff's Petition for Attorney's Fees and Expenses (R. 17). Defendant submitted a Response to Plaintiff's Request for Entry of Judgment (R. 18), which was mailed October 14, and filed October 20. It stated that Defendant was unaware that Plaintiff's Petition would be considered a motion under L.R. 7.1. Defendant also mailed its Response to Plaintiff's Petition for Fees and Expenses (R. 19), on Oct. 14, and it was filed Oct. 20.

On Oct. 24, Plaintiff replied to Defendant's Response to Plaintiff's Request for Entry of Judgment on Plaintiff's Petition for Fees and Expenses (R. 22), but also moved to Strike Defendant's Response (R. 20, Memorandum in Support, R. 21), arguing that Defendant's Response was untimely. Then, on Oct. 30, Defendant submitted a Supplementary Re-

sponse on the Issue of Expenses and Fees (R. 23), and also a Response to Plaintiff's Motion to Strike (R. 24, Memorandum in Support, R. 25), in which Defendant argued that Plaintiff's Petition for Fees and Expenses should have been considered a pleading, in which case Defendant's Response would be timely. Defendant also filed a Motion to Accept Belated Filing (R. 26) in case the Court did not agree that Plaintiff's Petition should be considered a pleading. On Nov. 3, Plaintiff replied to Defendant's Response on Plaintiff's Motion to Strike (R. 28), arguing that the deadline for responding to the Fee Petition ran from the day it was mailed, not the day it was received, and that a fee petition could not be considered a pleading. That day, Plaintiff also had a Response to Defendant's Motion to Accept Belated Filing (R. 27), arguing that Defendant had no grounds for excusable neglect and that, even under Defendant's excuse that it mistakenly took the Fee Petition for a pleading, Defendant's filing would still be untimely.

It is now the duty of the Court to sort all this out.

Defendant's Motion to Accept Belated Filing, Plaintiff's Motion to Strike, and Plaintiff's Motion for Entry of Judgment

Defendant argues that Plaintiff's Petition "should have been considered as a pleading, i.e. complaint, F.R.C.P. 7(a)." R. 25 at 2. However, Defendant's proffered reasons for thinking the petition was a pleading, that "there were no pending issues left ... for the Court to decide" (*Id.*), and that "[t]he agreement did allow the Plaintiff to file for relief" (*Id.*), do not explain why Defendant should think this. As Plaintiff points out, Fed.R.Civ.P. 7(a) states that only the complaint, answer, reply, answer to a cross-claim, and the third party complaint and answer are pleadings, and "[n]o other pleading shall be allowed." R. 27, at 2.

L.R. 7.1 sets a deadline of 15 days after service of initial brief in which to serve and file an answer. This applies to "[a] motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure, for summary judgment, for judgment on the pleading, for more definite statement, to strike, or motions made

pursuant to Rule 37 of the Federal Rules of Civil Procedure" and, unless the court otherwise directs, "all other motions." The Response, then, was due fifteen days after service of the fee petition. Plaintiff mailed the Petition on Sept. 17, so that, allowing 3 extra days for the mail under Fed.R.Civ.P. 6(e), the Response was due on Oct. 5. Since this was a Sunday, under Fed.R.Civ.P. 6(a), Defendant should have mailed the response on the following Monday, Oct. 6, 1997. R. 17 at 1. The Response was not mailed until Oct. 14.

Defendant filed a Motion to Accept Belated Filing, arguing that in mistaking the Petition for a Pleading, Defendant applied Fed.R.Civ.P. 6(c) and 6(e) (actually, that should be 12(a), 6(a) and 6(e)) which set a deadline of 23 days for a response. R. 26, at 1. Plaintiff states that a motion for extension of time filed after the time has expired may be granted only "where the failure to act was the result of excusable neglect." Fed.R.Civ.P. 6(b)(2). R. 27, at 2. "Excusable neglect is generally understood to be that course of action taken by a reasonably prudent person under the same or similar circumstances." *United States for Use and Benefit of Davison v. York Elec. Const. Co.*, 25 F.R.D. 478, 479 (D.N.D.1960). The movant has the burden of establishing such neglect. *Id.*

Plaintiff argues that Defendant has not shown excusable neglect because under the sole justification Defendant offers, the response was still untimely. R. 27 at 2. Defendant counts from the day it received service, Sept. 19. By Defendant's count, the twenty-three days (20 plus 3 for service by mail, Fed.R.Civ.P. 12(a) and 6(e)) in which it had to respond to the "pleading" ran out on Oct. 12. Because Oct. 12 was a Sunday which was followed by the Columbus Day holiday, Defendant maintains it could mail the Response on Tuesday, Oct. 14, under Fed.R.Civ.P. 6(a). The Response mailed on Tuesday, October 14, would then have been timely, Defendant claims, had Plaintiff's Petition been a pleading. R. 25, at 2. Plaintiff points out, however, that Fed.R.Civ.P. 5(b) provides, "Service by mailing is complete upon mailing." R. 28, at 1. Plaintiff mailed

the Petition on Sept. 17, so that even if the Petition were considered a pleading, the Response was due twenty-three days after September 17, on Friday, Oct. 10. *Id.* Plaintiff is correct: Defendant is late by four days even under the terms of its excuse. *See United Lawn Mower Sales & Service, Inc. v. Hagel* 1997 WL 327564 (E.D.Pa., June 12, 1997), at \*2–\*3 (counting service date for Motion to Dismiss from date it was mailed for purposes of determining due date of response). The Defendant, then, is guilty of a second error. Besides mistaking Plaintiff's Petition for a pleading, it also miscalculated the date the response would be due even if it were a pleading.

A reasonably prudent lawyer should have consulted the Federal Rules of Civil Procedure and the Local Rules of the Northern District of Indiana to determine the pertinent deadlines. While counsel for the City was not completely ignorant of the rules, he did misread and misunderstand them. His errors were predicated on these misreadings. The Court finds the errors surprising, but not inexcusable in that they plausibly explain why Defendant's counsel filed the Response on the date he did.

· The Court notes that in *Bleitner v. Welborn,* 15 F.3d 652, 653–54 (7th Cir.1994), the Seventh Circuit affirmed the granting of the government's untimely motion to extend a deadline in a habeas corpus case where the delay was brief and nonprejudicial and was not found to be inexcusably neglectful. In the case at hand, the Court similarly finds the delay to be brief and nonprejudicial and not inexcusably neglectful.

The Court grants Defendant's Motion to Accept Belated Filing and denies Plaintiff's Motion to Strike Defendant's Response to Plaintiff's Fee Petition. The Court therefore denies Plaintiff's Motion for Entry of Judgment which requests the exclusion of Defendant's Response.

Plaintiff's Fee Petition

Prevailing Party

Plaintiff petitions for an award of attorney's fees under 42 U.S.C. § 1988, which reads as follows:

In any action or proceeding to enforce a provision of [42 U.S.C. §§ ] 1981, 1982, 1983, 1985, and 1986 ..., title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

"To qualify as a 'prevailing party,' a plaintiff must succeed on a significant issue in litigation 'which achieves some of the benefit he sought in bringing suit.' " *Cady v. City of Chicago,* 43 F.3d 326, 328 (7th Cir.1994) (quoting *Farrar v. Hobby,* 506 U.S. 103, 107, 113 S.Ct. 566, 571, 121 L.Ed.2d 494 (1992)). "A plaintiff need not litigate the suit to judgment, but can 'prevail' if the litigation causes the defendant to act voluntarily in a way that 'affords the plaintiff all or some of the relief he sought through a judgment—e.g., a monetary settlement or a change in conduct that redresses the plaintiff's grievances.' " *Cady,* 43 F.3d at 328 (quoting *Hewitt v. Helms,* 482 U.S. 755, 760–61, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987)); *Zinn by Blankenship v. Shalala,* 35 F.3d 273, 274 (7th Cir.1994). "[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Cady,* 43 F.3d at 328 (quoting *Farrar,* 506 U.S. at 111–12, 113 S.Ct. at 573).

■ The Seventh Circuit has a two-part test to determine when a party prevails where there has been no adjudication. First, the plaintiff is required to show that his lawsuit was "causally linked to the achievement of the relief obtained." *Cady,* 43 F.3d at 328; *Zinn,* 35 F.3d at 274. Secondly, "the defendant must not have acted wholly gratuitously in response to the suit; i.e., the plaintiff's claim must not have been frivolous, unreasonable or groundless." *Cady,* 43 F.3d at 328–29 (quotations omitted); *Zinn,* 35 F.3d at 274. The Court notes that Defendant applied the two-part test of the Tenth Circuit (R. 19 at 1), which differs significantly from that of the Seventh Circuit in regard to the second part: "[Plaintiff] must also demonstrate that the defendant's conduct in response to the lawsuit was required by the Constitution or federal law, i.e. the defen-

dant's actions must be legally required." *Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and Rehabilitation Services,* 31 F.3d 1052, 1053 (10th Cir.1994). This Court, of course, must follow the Seventh Circuit's lower standard in regard to the second part of the test.

■ The first part of the test is a factual determination. *Cady,* 43 F.3d at 329; *Dixon v. City of Chicago,* 948 F.2d 355, 358 (7th Cir.1991). Before Plaintiff filed, the parties could not reach agreement. In its Complaint, Plaintiff sought to lift Defendant's restriction limiting to 20 the number of ralliers who would be allowed to stand together on the Courthouse steps. R. 1, ¶ 19(c). The Complaint included the estimate that 50 ralliers would need to be accommodated. *Id.,* ¶ 12. It was not until the day before the rally was to take place, that is, after Plaintiff filed the Complaint and after a preliminary hearing and negotiations pursuant to the Complaint, that the Defendant agreed to allow 50 ralliers to stand together on the Courthouse steps, and to provide transportation for 25. R. 15 at 3.

The City, on the other hand, argues that the Klan refused to provide a serious estimate of the number of participants who would show up for the rally. R. 19 at 2. The City maintains that for reasons of public safety, it had to plan on a reasonably reliable estimate of how many ralliers there would be. *Id.* In planning for 20, the City was depending on the previous experience of the Indiana State Police. Affirmation of Kerry L. Uhrick at 2–3, attached to R. 19. The City insists the issue was not the right of Klan ralliers to demonstrate, but rather the City's right to set a limit on the number of participants based on a serious estimate. In the Settlement Agreement, Plaintiff accepted a limitation of the number of participants at 50. R. 19 at 2. The City further claims it was not the lawsuit that triggered the Settlement Agreement, but rather the Klan's sudden reasonableness in providing a serious estimate after the preliminary hearing. *Id.*

In the Court's view, it is critical to decide whether the Klan provided the City with the estimate of 50 ralliers before the commencement of the suit. Presumably, the City would have accommodated 50 ralliers had the Klan provided this estimate, since the issue for the City was not the number of participants, but the need to set a limit at some number. The Affirmation of Kerry L. Uhrick contains the following statement:

> I informed Mr. Berry that he would need to let me know the answers to those questions [how many ralliers] on the Monday before July 19, 1997 that date being July 14, 1997. On July 14, 1997, I was finally able to contact Mr. Jeffrey Berry and ask him how many ralliers he expected. His initial response was that his people were still working and he did not know how many he was going to have. I informed him of the necessity for this information. He then responded in a flippant manner by saying, 'oh then say fifty.' I responded to Mr. Berry by saying, 'Now Jeff, I need to know really how many are you going to have?' (Emphasizing the word really) His response to that was in an equally or even more flippant manner stating 'oh, then say a hundred.' The clear indication was that Mr. Berry either did not know or would not tell me how many ralliers he expected to have.

Attachment to R. 19 at 2. Beyond the flippant tone in the Reverend Berry's voice, Chief Uhrick does not explain why he did not take the estimate of 50 seriously. Perhaps the number was out of line with the 20 the Chief would have expected. However, in the Court's view, 50 ralliers does not seem to be so large a number as to defy credulity. As it happened, the Klan included the estimate of 50 in its Complaint, suggesting that this estimate was a serious one all along. Since the rally implicated a Constitutional right, the City should have had the prudence to accept the estimate even if it seemed high. It would have been an easier matter to adjust for fewer ralliers than to deny more than half of them their right to free speech.

It appears, then, that Plaintiff achieved the benefit it sought in the suit, and by means of the suit effected a change of conduct in the Defendant that redressed Plaintiff's grievances, a modification of behavior directly benefitting the Plaintiff. In short, the law-

suit secured substantial relief for the Plaintiff.

In order for Plaintiff to be the prevailing party, it must also pass the second part of the Seventh Circuit's test: the Plaintiff's claim must not have been "frivolous, unreasonable or groundless." *Cady*, 43 F.3d at 328–29. In contesting the second part of the test, Defendant uses the higher standard of the Tenth Circuit noted above (R. 19 at 1): "the defendant's conduct in response to the lawsuit was required by the Constitution or federal law, i.e. the defendant's actions must be legally required." *Kansas Health Care Assoc.*, 31 F.3d at 1053. This Court, however, need not address the Tenth Circuit's test, and makes no ruling on whether Defendant's actions were legally required. Defendant goes on to argue that the City's agreement to provide transportation, which was part of the Settlement Agreement, was not required by the Constitution. R. 19 at 3. The gravamen of Plaintiff's complaint, however, was not that the City was restricting free speech by refusing to provide transportation, but rather that the City was restricting free speech by limiting to 20 the number of ralliers who could stand together when the Klan estimated that 50 would wish to do so as an expression of solidarity with the message of the rally. R. 3 at 2. According to the Klan, such a restriction, in its anticipation that bystanders would react violently to the message, would be a content-based regulation triggering heightened scrutiny. R. 3 at 6–8. Because of the difficulty the City would have in meeting this high standard, the Court cannot say that the suit was frivolous, unreasonable, or groundless as a matter of law.

Defendant also argues that Plaintiff's fees are unreasonable and excessive, an issue the Court will deal with in its discussion of reasonable fees below.

Defendant's third objection is that Plaintiff failed to join the County of DeKalb and/or the State of Indiana as a party, and therefore the Petition should be dismissed pursuant to Fed.R.Civ.P. 12(b)(7). R. 19 at 4. Rule 12(b)(7) states that a defendant may make a motion to dismiss a claim for "failure to join a party under rule 19." Rule 19 provides that a person who is subject to

service and whose joinder will not deprive the court of subject matter jurisdiction shall be joined if (1) complete relief cannot be accorded in the person's absence, or (2) the person has an interest in the action and the disposition of the action may (i) impede the person's ability to protect that interest or (ii) leave persons who are parties subject to the substantial risk of incurring multiple or inconsistent obligations because of the claimed interest. Defendant preserved this defense in the Settlement Agreement, ¶ 4, which states that "Defendant shall have all defenses provided under the law available to it to defend against the [fee] petition."

Defendant argues that DeKalb County should be joined because the County owned the Courthouse and its steps where the rally would take place. R. 19 at 4. Defendant also argues that the Indiana State Police should be joined because the State Police was in charge of security for the rally. *Id.* Defendant does not explain why either of these facts necessitate joinder of these parties. The Klan sued the City for injunctive relief from the City's decision to impose restrictions on the rally. There is no evidence that the City needed approval or permission from the County or from the State Police to lift these restrictions. Both before and after the lawsuit was filed, the City was capable of lifting the restrictions by itself, as it eventually did in the Settlement Agreement. Because of this, the City, and only the City, is liable for attorney's fees. Rule 19(a)(1), then, doesn't require the County or the State Police to be joined since complete relief could be and was accorded Plaintiff without the joinder of these other parties. Furthermore, there is no evidence that the County or the State Police claim an interest in the action. This means that 19(a)(2) does not require joinder either. Consequently, the City's joinder objection to the action has no merit.

The Court finds that Plaintiff is the prevailing party.

Reasonableness of the Fees

Since Plaintiff is the prevailing party, its attorneys are entitled to a reasonable fee. Initially, the Court must determine the "lodestar" amount by multiplying the reasonable number of hours expended by a reasonable

hourly rate. *Spellan v. Board of Educ. for Dist. 111,* 59 F.3d 642, 645 (7th Cir.1995); *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1543–44, 79 L.Ed.2d 891 (1984). "Adjustment to that fee then may be made as necessary in the particular case." *Blum,* 465 U.S. at 888, 104 S.Ct. at 1544; *Hensley v. Eckerhart,* 461 U.S. 424, 434 n. 9, 103 S.Ct. 1933, 1940 n. 9, 76 L.Ed.2d 40(1983). District courts have "discretion in determining the amount of the fee award. This is appropriate in view of the district court's superior understanding of the litigation ..." *Id.* at 437, 103 S.Ct. at 1941.

Plaintiff presents the following fees:

|  | Hours | Rate | Lodestar |
|---|---|---|---|
| Hamid R. Kashani | 29.10 | $275 | $ 8,002.50 |
| Kenneth J. Falk | 11.00 | $275 | $ 3,025.00 |
| Total Lodestar |  |  | $11,027.50 |

R. 14 at 2. The only objection which Defendant makes to this amount is that the $275.00 per hour rate "is unreasonable and does not reflect a reasonable rate in the Northern District of Indiana, Fort Wayne Division." R. 19 at 4.

"The statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, ...." *Blum,* 465 U.S. at 895, 104 S.Ct. at 1547. Moreover:

> To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.

*Id.,* n. 4. The affirmations Plaintiff presents fully support the $275 per hour rate for lawyers practicing in the Indianapolis, Marion County, market. These affirmations are not as supportive of that rate for a civil rights lawyer of comparable skill, experience and reputation in the Auburn, DeKalb County, market. While the affirmations attest to the skills and experience of Plaintiff's counsel, they do not address the question of whether such skill and experience were necessary for this particular case, or whether local counsel could have handled the case as expeditiously as counsel from Indianapolis. As a result, the affirmations don't provide the "prevailing market rate." Mr. Carpenter, whose practice is in Auburn, provides an Affirmation for the Defense which states that his hourly rate is $100.00 per hour. Attachment to R. 19.

The Seventh Circuit addressed the issue of determining reasonable attorney's fees for out of town lawyers in *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760 (7th Cir.1982). The Appeals Court stated:

> If a high priced, out of town attorney renders services which local attorneys could do as well, and there is no other reason to have them performed by the former, then the judge, in his discretion, might allow only an hourly rate which local attorneys would have charged for the same service. On the other hand, there are undoubtedly services which a local attorney may not be willing or able to perform. The complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally.

*Id.* at 768. In *Gusman v. Unisys Corp.,* 986 F.2d 1146 (7th Cir.1993), the Seventh Circuit narrowed somewhat a District Court's discretion to reduce attorney's fees because of a lower community rate. The Circuit stated, "[L]awyers who fetch above-average rates are presumptively entitled to them, rather than to some rate devised by the court." *Id.* at 1150, citing *Matter of Continental Illinois Securities Litigation,* 962 F.2d 566, 568 (7th Cir.1992), "It is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." See also, *Pressley v. Haeger,* 977 F.2d 295, 299 (7th Cir. 1992) and *Barrow v. Falck,* 11 F.3d 729 (7th Cir.1993). However, though *Gusman* states that "the best measure of the cost of an attorney's time is what that attorney could earn from paying clients," the opinion also made it clear that the attorney's billing rate

is "a presumptive rather than a dispositive figure." *Gusman*, 986 F.2d at 1150. The Appeals Court went on to state:

> A judge who departs from this presumptive rate must have some reason other than the ability to identify a different average rate in the community. A judge might say, for example, that the lawyers did not display the excellence, or achieve the time savings, implied by their higher rates. A judge might conclude that the plaintiff did not need top flight counsel in a no-brainer case.

*Id.* at 1151. In conjunction with the different average rate in the relevant community, it is this last reason for departure from the presumptive rate that the Court finds relevant. This case was a rather straightforward First Amendment case. As it happened, the case did not require any litigation. Its resolution was only a matter of negotiating the number of ralliers who would be allowed to stand together. The case did not demand the talents of specialized counsel from a major city.[1] Not that the case was a "no brainer." But surely the Seventh Circuit did not mean to imply that "no brainers" are appropriate for local counsel, and anything else should only be entrusted to lawyers from the big city.

The Court is mindful that, given the possible unpopularity of Plaintiff's message, Plaintiffs may have had difficulties in obtaining appropriate counsel in Auburn. However, the Court is familiar with available counsel in Fort Wayne, where this Court sits, and believes that a number of lawyers here would have been willing and able to handle the case competently and effectively. The Court finds that there was no need for Plaintiff to use the services of out of town counsel. For purposes of determining a reasonable fee predicated on the prevailing market rate, the relevant community is Fort Wayne.

Defendant has filed a Supplemental Memorandum (R. 23) containing an Order issued by this Court on July 17, 1997, in which the Court determined Attorney's Fees in an employment discrimination case. *Morimanno*

*and Walls v. Taco Bell*, 979 F.Supp. 791 (1997). In that case, the court determined that the market rate for plaintiffs' lawyer who prevailed in an employment civil rights case was $175 per hour. Order, at 14. The lawyer involved had been in practice for five years, 90% of his billable hours were devoted to plaintiffs' civil rights litigation, and his record was exemplary. Several local attorneys testified to his skill and professionalism. *Id.*, at 12. Christopher Myers, a local attorney with eighteen years of experience whose practice consists almost entirely of civil rights and employment cases, testified that the fee rates for civil rights lawyers in Fort Wayne range from $125 to $225 per hour (*Id.*); Eric Chickedantz, a local attorney with twenty-five years of experience, placed the range at $150 to $200 per hour. *Id.* at 12–13.

The Affirmation of Mr. Kashani lists more than thirty cases in which he has represented civil rights clients (mostly prisoners) in federal courts over the past five years. Mr. Falk's Affirmation lists more than forty cases before federal and state courts in the past ten years. Because of the experience of these attorneys, the Court is inclined to award them a fee at the high end of fee rates that lawyers in Fort Wayne would receive for their services in civil rights litigation. However, because this was not a matter of complex litigation and did not require the expertise of "top-notch" lawyers, the Court finds that something less than the highest rate lawyers would be able to obtain in Fort Wayne would be appropriate. The Court then sets the fees for Mr. Kashani and Mr. Falk at $200 per hour and adjusts the lodestar calculation downward so that the hours of Plaintiff's counsel are multiplied by $200.

|  | Hours | Rate | Fee |
|---|---|---|---|
| Hamid R. Kashani | 29.10 | $200 | $5,820.00 |
| Kenneth J. Falk | 11.00 | $200 | $2,200.00 |
| Lodestar |  |  | $8,020.00 |

To this amount Plaintiff's claimed expenses should be added.

---

1. See *Cooper v. Casey*, 97 F.3d 914, 920 (7th Cir.1996), "It is no more reasonable to pay a lawyer $1,000 an hour for services that can be obtained at $200 an hour than it is to pay $1,000 for an automobile hood ornament that you could buy elsewhere for $200. Judges have to be careful when they are spending other people's money."

| | |
|---|---|
| Hamid R. Kashani, expenses | $  227.12 |
| Kenneth J. Falk, expenses, | $  150.00 |
| Lodestar | $8,020.00 |
| | |
| Total Fees and Expenses | $8,397.12 |

The Court then grants Plaintiff's attorneys $8,397.12 for fees and expenses.

## CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's Motion to Strike, DENIES Plaintiff's Request for Entry of Judgment, GRANTS Defendant's Motion to Accept Belated Filing, and GRANTS Plaintiff's petition for Attorney Fees and Expenses in the amount of $8,397.12.